392 S.E.2d 693

**George W. KEYES, Jr., Individually
and as Administrator of the Estate
of George W. Keyes, Deceased**

v.

**Robert J. KEYES, Annalaura Keyes,
and Maude Keyes.**

**No. 19126.**

Supreme Court of Appeals of
West Virginia.

April 16, 1990.

nearby. The other parties in the case are the decedent's brother, Robert Keyes, and Robert's wife, Annalaura Keyes.

Shortly after his father's death, George Jr. was named administrator of George W. Keyes's estate. George Jr. alleges that his grandmother, Maude Keyes, improperly took charge of George W. Keyes's funeral arrangements and did not allow George Jr. any say in these arrangements, despite his appointment as administrator. George Jr. also alleges that his relatives conspired to shunt him into an inconspicuous, uncomfortable seat at his father's funeral. In addition, George Jr.'s name was not mentioned in the newspaper obituary or at the funeral; he was not allowed to ride with the family to the funeral; and, he was not allowed to erect the gravestone he had chosen. After the funeral, George Jr. attempted to collect the property of the estate, but he was hindered in this, he alleges, by the concerted efforts of the defendants. George Jr. also alleges that the defendants attempted to flee with property of the estate to Robert Keyes's home in California, hauling things away in a 1983 Chevrolet Monte Carlo automobile, itself titled in the name of the decedent and allegedly part of the decedent's estate.

Resenting his ill treatment at the hands of the other survivors and their alleged theft of estate property,[1] George Jr. brought this civil action in the Circuit Court of Wayne County, naming as defendants Maude Keyes, Robert Keyes, and Annalaura Keyes. The trial court in a bench trial found that the defendants had converted property of the estate and intentionally inflicted emotional distress on George Jr. The court awarded George Jr. $25,000 in compensatory damages, without apportioning the amount between lost property and emotional distress, and $5000 in punitive damages for wilful misconduct. We now reverse the judgment of the trial court and enter final judgment here for the defendants.

Lafe C. Chafin, Barrett, Chafin, Lowry & Hampton, Huntington, for Robert Joseph Keyes, Annalaura Keyes, & Maude Keyes.

Kenneth H. Fisher, Fisher & Young, L.C., Huntington, for George W. Keyes, Jr.

NEELY, Chief Justice:

In this family dispute, the defendants appeal judgment against them in the Circuit Court of Wayne County for $25,000 in compensatory damages and $5000 in punitive damages.

George W. Keyes died intestate on 21 January 1987. He had been divorced from the mother of his only child, George W. Keyes, Jr. The decedent's house in Prichard, West Virginia, was owned by the decedent's mother, Maude Keyes, who lived

**1.** All of the estate property would presumably go to George Keyes Jr. under this State's intestacy laws. *W.Va.Code,* 42-1-1 [1957].

## I. Dead Man's Statute

■ There is some question in this case about the applicability of the Dead Man's Statute, *W.Va.Code*, 57-3-1 [1937], which limits the admissibility of self-serving testimony about transactions with a person who died before trial. Under the statute, much of the testimony in this trial would have been inadmissible. On the other hand, the statute would have excluded much relevant and probative evidence. As a matter of fairness, the trial judge suggested that he should admit evidence from all parties equally, even though evidence from both sides would run afoul of the Dead Man's Statute. Counsel for all parties agreed to the judge's arrangement, and we see no error in the judge's allowing the case to proceed on those ground rules. As trier of fact, the judge retained his power to determine the credibility and weight of all testimony. Neither side was prejudiced by the novel arrangement.

## II. Property of the Estate

■ From the testimony at trial, it is clear that the personal property of the decedent was substantially commingled with property of his mother, Maude Keyes. The main task of the administrator, George Jr., and the rest of the family was to sort out what property belonged to the decedent and what did not. The defendants were not as helpful in this task as they might have been, but they did finally offer George Jr. most of the decedent's property, set aside in boxes at the decedent's house.

The main property dispute at trial concerned an automobile titled in the decedent's name, a 1983 Chevrolet Monte Carlo. The trial judge found that the car was property of the decedent's estate—because, he held, under this State's automobile title system, the certificate of title is conclusive proof of ownership. This was error. As we held in Syllabus Point 3, *Commercial Credit Corporation v. Citizens National Bank of Point Pleasant*, 148 W.Va. 198, 133 S.E.2d 720 (1963), concerning title to automobiles:

> A certificate of title is not conclusive proof of ownership but is merely evidence in establishing title which may be rebutted by other evidence.

In this case, the evidence was overwhelming that the car in question actually belonged to Maude Keyes. Maude Keyes paid the purchase price for the automobile and was listed on the certificate of title as the only lienholder. There was no evidence that Maude Keyes intended a gift to the decedent. The title arrangement was a ruse: Maude Keyes could not obtain liability insurance on the car if titled in her own name. The car was insured in the decedent's name, and Maude Keyes was specifically excluded from coverage under the policy. The effect of this arrangement as between the Keyeses and third parties does not concern us; as between Maude Keyes and the decedent, however, Maude Keyes was the owner. Legally, Maude Keyes may be said to have held a *purchase money resulting trust* in the automobile. This is a trust arising by operation of law, tantamount to outright ownership. *See generally* Note, "Purchase Money Resulting Trusts in West Virginia," 39 *W.Va.L.Rev. (W.Va.L.Q.)* 58 (1932), and cases cited therein.

The trial judge in his final order, also set forth a detailed list of other property of the estate. We find no error in these other dispositions, and affirm the judgment below in this respect. However, it appears from the trial judge's final order that he may have allotted some unspecified amount of compensatory damages for loss, conversion, or destruction of estate property. Although the evidence of such loss is not overly compelling, we cannot say that the trial judge was clearly wrong in that finding. We therefore must remand the case for a precise determination of such damages, if any.

## III. Tort of Outrage

■ This Court first recognized the tort of outrage in Syllabus Point 6, *Harless v. First National Bank in Fairmont*, 169 W.Va. 673, 289 S.E.2d 692 (1982):

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional dis-

tress, and if bodily harm to the other results from it, for such bodily harm.

We pointed out in *Harless* that the jurisprudence of this new tort must necessarily be restrained. Especially where no physical injury accompanies the wrong, the tort of outrage is a slippery beast, which can easily get out of hand without firm judicial oversight.

In *Harless*, we followed the outrage definition of *Restatement (Second) of Torts* § 46 (1965). We quoted with approval the official comments to that *Restatement* section, which provide in pertinent part:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go *beyond all possible bounds of decency*, and to be regarded as *atrocious*, and *utterly intolerable in a civilized community*.

*Harless* at 693–94, 289 S.E.2d at 703–4, n. 20 (emphasis added). This is a high standard indeed. As the Virginia court has put it, "This requirement is aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and mere hurt feelings are involved." *Womack v. Eldridge*, 215 Va. 338, 210 S.E.2d 145, 148 (1974), quoted with approval, *Harless*, 169 W.Va. at 695, 289 S.E.2d at 704.

 The case before us epitomizes "bad manners" and "mere hurt feelings." As we all know, death and its attendant ceremonies can bring out the best and the worst in families. Etiquette should smooth the rough spots and help the family accept with dignity the death of one of their own. In our fragmented society, sadly, etiquette may be more honored in the breach than the observance. Judith Martin, in her "Miss Manners" column, offers this distressing illustration:

> Miss Manners once attended a funeral at which a United States senator, in introducing other speakers, referred to himself as "your emcee." He and other political speakers were so robustly cheered for their efforts that when a member of the deceased's family then wept as he spoke, the sorrow amid such entertainment seemed out of place.

J. Martin, "Turning Off the Applause Sign," *The Washington Post*, April 1, 1990, at F7, col. 3. Our distaste for legal recognition of breaches of etiquette does not in the least diminish the importance of etiquette. Quite the contrary: Etiquette governs things that are more important to people than most of the things for which courts do offer redress.

 We agree with the plaintiff, George Keyes Jr., that a funeral is no time for internecine warfare. Overt jealousy about funeral arrangements is doubtless a serious breach of etiquette. As the trial judge put it, the defendants' actions constituted "deliberate, hateful-minded, pretty mean conduct." We part ways with the plaintiff, however, on the question of remedy. In such circumstances, we believe, a lawsuit merely compounds the original wrong. Once the lawyers are called in, a regrettable slight suffers a sea change. Molehills become mountains, and people become alienated from their own families for decades. As we point out above, the tort of outrage will lie only when the behavior is "utterly intolerable in a civilized community." When resort to legal process does more to aggravate the original slight than to redress it, especially within the family, no action will lie for outrage. To allow the claim in such circumstances flies in the face of the public policy underlying the tort, that is, to encourage people to treat one another civilly. In this case, therefore, we find no ground for the trial court's award of compensatory or punitive damages for emotional distress.

### Conclusion

For the reasons above, we find no basis for the trial court's award of compensatory or punitive damages. As to the trial

court's determination of the property of the estate, we affirm in part, and reverse in part, the judgment of the Circuit Court of Wayne County. The case is remanded to that court for further proceedings consistent with this opinion.

Affirmed in Part, Reversed in Part, and Remanded.